FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2001 FEB 13. PM 4: 54

LORETTA G. WHYTE
CLERK

### UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **KENNETH BEVLEY** | : | **CIVIL ACTION** |
| **VERSUS** | : | **NO. 00-0007** |
| **UNITED STATES OF AMERICA** | : | **SECTION "T"(5)** |

### PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS AND MOTION FOR SUMMARY JUDGMENT

MAY IT PLEASE THE COURT:

The Plaintiff Kenneth Bevley, urges this Honorable Court to deny the Defendants Motion to Dismiss and Motion for Summary Judgment and find that this Court does has jurisdiction under the Federal Tort Claims Act, 28 U.S.C. § 2675.

I.    **STATEMENT OF THE CASE**

Plaintiff Kenneth Bevley is currently an inmate in the custody of the United States Bureau of Prisons. At all times relevant to this action, he was in the physical custody of the  Tangipahoa Parish Jail (hereinafter "TPJ") in Amite, Louisiana as a federal pretrial detainee. Plaintiff was in the legal custody of defendant United States of America, through the U.S. Marshal Service. On July 23, 1997, Plaintiff was transferred to TPJ from Orleans Parish Prison (hereinafter "OPP"), where he had first begun to experience hemorrhoid problems in April, 1997. Unfortunately, Plaintiff's condition continued to worsen while incarcerated at TPJ due to the repeated denials by Defendant to allow Plaintiff to undergo required medical treatment at the local hospital, as



ordered by his treating physician. As a result, Plaintiff suffered severe and totally unnecessary pain and suffering and a worsening of his physical condition which ultimately rendered surgery necessary.

Plaintiff 's current complaint alleges that defendant violated the Federal Tort Claims Act by its negligent refusal to provide required medical care and treatment to Plaintiff for his serious, persistent, and extremely painful hemorrhoid condition, thus breaching its duty to provide for the care and safekeeping of federal prisoners.


II.    **FACTS**

During the time period at issue in this case, plaintiff Kenneth Bevley was incarcerated at Tangipahoa Parish Jail (herinafter "TPJ") in Amite, Louisiana as a federal pretrial detainee in the legal custody of defendant USA through the U.S. Marshal Service (USMS). On July 23, 1997, Plaintiff was transferred to TPJ from Orleans Parish Prison (hereinafter "OPP"), where he had first begun to experience hemorrhoid problems in April, 1997.

Shortly after his transfer to TPJ, on August 6, 1997, plaintiff submitted a Request for Medical Attention form complaining of hemorrhoid pain and pain when he used the restroom. Plaintiff was examined by Dr. Bert Ducote on August 14, 1997, and complained of blood in his stool and severe rectal pain. Dr. Ducote diagnosed plaintiff as suffering from hemorrhoids, prescribed medication, and referred Plaintiff to the surgery clinic at Lallie Kemp Hospital. See Deposition of Dr. Bert Ducote, at 7-8, attached hereto as Exhibit 6. This same referral was made by Dr. Ducote on two other occasions as well. On all three occasions, defendant denied permission to remove plaintiff from TPJ for required medical services ordered by his physician.

As the legal custodian of plaintiff, defendant had a duty to provide for his medical care and welfare. In addition, a contract existed between TPJ and defendant USA, through the United States Marshal Service, for the provision of medical care for federal inmates. That contract required TPJ to contact the USMS "to obtain prior authorization for removal [of federal prisoners] for all other medical services required." Excepted from the requirement of prior authorization was removal of federal prisoners for emergency medical care. In addition, the USMS was responsible for payment of expenses for hospitalization and surgery for all federal prisoners.

Plaintiff's hemorrhoid condition caused him to experience blood in his stool and severe rectal pain shortly after his arrival at TPJ. He was examined by Dr. Bert Ducote on August 14, 1997. Dr. Ducote confirmed a diagnosis of hemorrhoids and prescribed medication. Dr. Ducote also referred Plaintiff to the surgery clinic at Lallie Kemp Hospital. See Deposition of Dr. Bert Ducote, at 7-8, attached hereto as Exhibit 6.

A request was submitted by TPJ nurse Deanie Brumfield to Defendant William Ard at the USMS for approval for plaintiff to leave TPJ premises and be transported to Lallie Kemp Hospital. See Fax of 8/19/97, attached hereto as Exhibit 3. On August 20, 1997, the request was denied by Defendant William Ard.

On August 28, 1997, plaintiff submitted another Request for Medical Attention form in which he complained of continuing problems of rectal bleeding. On September 5, 1997, Dr. Ducote again examined plaintiff and diagnosed him as suffering from external hemorrhoids. Dr. Ducote again referred plaintiff to Lallie Kemp Hospital's surgery clinic. On the same day, a second request was submitted by Nurse Brumfield to defendant, again requesting approval for plaintiff to be transported to Lallie Kemp Hospital. See Deposition of Dr. Bert Ducote, at 8,

attached hereto as Exhibit 6.  On September 8, 1997, defendant again denied approval for plaintiff to be transported to the surgery clinic at Lallie Kemp Hospital.

Following the second denial, plaintiff complained to the Warden of TPJ concerning his severe rectal pain and need for further treatment.  See Pro Se Complaint.  The Warden informed plaintiff that nothing more could be done because the USMS would not pay for the surgery.  Id.

On September 22, 1997, plaintiff submitted another Request for Medical Attention form in which he complained of continued pain and bleeding from the rectum.  On October 6, 1997, plaintiff was seen by Dr. Ducote who confirmed that plaintiff still suffered from external hemorrhoids.

On October 19, 1997, Plaintiff submitted another Request for Medical Attention form complaining of continued bleeding from his rectum which had worsened and become more painful.  On October 22, 1997, in an Order issued by this Court, Magistrate Judge Alma Chasez ordered that Plaintiff be presented to the TPJ physician for evaluation and/or treatment as soon as possible for problems stated in his pro se Complaint, which was filed in federal court on October 20, 1997.  This Court, through Judge Porteous, also intervened to secure medical attention for plaintiff during his criminal trial.   In response to the Court's order, plaintiff was seen by Dr. Ducote who confirmed plaintiff's complaint of rectal bleeding and diagnosed plaintiff as having a thrombosed external hemorrhoid.  Dr. Ducote considered this to be an emergency condition. See Deposition of Dr. Ducote, at 14, attached hereto as Exhibit 6.  Consequently, plaintiff was referred to the emergency room of Lallie Kemp Hospital.  He was sent to the emergency room on October 23, 1997, where he was seen by a specialist.  That specialist referred plaintiff to the surgery clinic for a hemorrhoidectomy.  Pursuant to such referral, an appointment at the surgery

clinic was arranged for the Plaintiff on November 18, 1997; this appointment was made without the approval of defendant.

On October 23, 1997, a third request was submitted to Defendant Ard at the USMS for approval for surgery for Plaintiff. See Fax of 10/23/97, attached hereto as Exhibit 5. No response to that request was ever received. On November 17, 1997, one day prior to his scheduled surgery, Plaintiff was transferred to the custody of the U.S. Bureau of Prisons and incarcerated at the United States Penitentiary in Beaumont, Texas. Plaintiff finally underwent the much-needed hemorrhoidectomy on February 12, 1998, more than 5 months from Dr. Ducote's initial recommendation. Plaintiff's transfer to BOP meant that USMS did not have to bear the expense of plaintiff's surgery.

As a result of defendant's denial of required medical care, plaintiff was made to suffer unnecessary and severe physical pain and worsening of his medical condition, which deteriorated so that it did eventually become an emergency.

III.    STANDARD OF REVIEW

A. Motion to Dismiss- Rule 12(b)(1)

To prevail on a Motion to Dismiss, the defendant must show that plaintiff has failed to state a claim upon which relief may be granted. See Fed. R. Civ. P. 12(b)(6). "The motion to dismiss for failure to state a claim is viewed with disfavor and is rarely granted." Kaiser Aluminum & Chem. Sales v. Avondale Shipyards, 677 F.2d 1045, 1050 (5th Cir. 1982), citing Wright & Miller, Federal Practice and Procedure: Civil [**12] § 1357 at 598 (1969). First, the complaint must be liberally construed in favor of the plaintiff, and all facts pleaded in the complaint must be accepted as true. See Kaiser at 1045, citing Miller v. Stanmore, 636 F.2d 986,

988 (5th Cir. 1981). Second, the court should not dismiss a complaint for failure to state a claim "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." See Kaiser at 1045, citing Conley v. Gibson, 355 U.S. 41, 45-46 (1957).

Plaintiff Bevley has sufficiently pleaded facts in his complaint that would entitle him to relief. His claim against defendant relies on duties that defendant United States owed to Mr. Bevley under the Federal Tort Claims Act. Therefore, Defendant United States has failed to satisfy the requirements of Federal Rule of Civil Procedure 12(b)(6), and this Partial Motion to Dismiss should be dismissed.

B. Summary Judgment – Rule 56

To prevail on a Motion for Summary Judgment, the defendants must first show that there is no genuine issue as to any material fact and, secondly, that they are entitled to Judgment as a matter of law. See Fed. R. Civ. P. 56 (c). To determine if there are genuine issues of material fact, the court must consult the applicable substantive law to determine the material factual issues. King v. Chide, 974 F.2d. 653, 656 (5th Cir. 1992). Additionally, the court must view all of the evidence in the light most favorable to the party opposing the motion. Id.; United States v. Diebold Inc., 369 U.S. 654, 655 (1992); Reid v. State Farm Mutual Auto Inc., 784 F.2d. 577,578 (5th Cir. 1986)

So as not to deprive the litigants of a trial to which they are entitled, the Court must determine whether there are inferences or circumstantial evidence which might suffice to create a factual dispute about the plaintiff's claim. Fontenot v. Upjohn, 780 F.2d. 1190, 1197 (5th Cir. 1986).

Moreover, the judge's function at the summary judgment phase is "not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby Inc., 477 U.S. 242, 249 (1986). While the plaintiff must present specific facts sufficient to establish a genuine issue at trial, if evidence shows that a reasonable jury could return a verdict for the plaintiff, the dispute is genuine. See Id. at 247-49.

The Plaintiff in this case has presented sufficient evidence demonstrating that there are several geruine factual disputes and that a reasonable jury could decide in his favor. Further, the material facts in dispute render judgment as a matter of law inappropriate. As such, defendant has failed to satisfy the requirements of Federal Rule of Civil Procedure 56(c) and its Motion for Summary Judgment should be dismissed.

IV.    **LAW AND ARGUMENT**

A.    **PLAINTIFF'S FTCA CLAIM IS NOT PRECLUDED BY THE DISCRETIONARY FUNCION EXCEPTION OF 28 USC § 2680 BECAUSE DEFENDANT DID NOT EXERCISE DUE CARE**

The United States in its Motion to Dismiss and Motion for Summary Judgment has argued that it is immune from suit under the discretionary function exception of the Federal Tort Claims Act, 28 USC § 2680.  Plaintiff opposes defendant's motions on two grounds.  First, the discretionary function exception is not applicable in this case.  Although that statue does shield the government from suit in many instances it is inapplicable to the case at bar, which involves negligence by a low level government employee.  Second, in the alternative, if this Court agrees with defendant that the discretionary function does apply, a due care requirement still exists which renders defendant liable in this case.

*1.The discretionary function exception is not applicable in this case*

The Federal Tort Claims Act, 28 U.S.C. 1346 et seq., waives sovereign immunity from suit for specified torts committed by federal employees.  Its purpose is to relax by legislation the rigor of the immunity rule.  The Act grants the federal district courts exclusive jurisdiction over claims against the U.S. for money damages for injury :

> "caused by the negligent or wrongful act or omission of any employees of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. 1346(b).

Section 2680 provides the exception from tort liability relied by defendant.    It excepts from the scope of the Act:

"(a) any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." Section 2680.

Defendant argues that William Ard as an agent of the government had the authority to approve or deny the repeated requests for authorization to send plaintiff to an off-site medical clinic, and that his denial therefore falls within the exclusion of immunity of the Federal Tort Claims Act. This argument vastly overstates the stretch of the discretionary function exception.

A review of the legislative history of the Act was undertaken by the Supreme Court in Dalehite v U.S., 73 S.Ct. 956 (1953) and approved more recently in U.S. v. Varig Airlines, 467 U.S. 797 (1984). The Act was passed based on a belief that "the government should assume the obligation to pay damages for the misfeasance of employees in carrying out its work." Dalehite at 961. Congress thus desired "to waive the government's immunity from actions for injuries to person and property occasioned by the tortious conduct of its agents acing within their scope of business." Id. At 964. Congress intended to grant relief for "ordinary common-law torts," Id. p. 964, for run-of-the-mill accidents, as distinguished from injury from performing discretionary governmental functions. Id., FN 19, p. 965. An example given repeatedly for submitting the US to tort liability was negligence in the operation of vehicles by federal employees. Id.

Thus, Congress did not intent to relieve the government from liability for common law torts in passing the discretionary function exception to liability. The discretionary function exception covers negligence in policies or plans for authorized governmental activities. It applies to large picture policy decisions of a regulatory or governmental nature. As stated in the dissent in Dalehite, "It is not a tort for government to govern." Id. p. 979. Congress intended the discretionary function exception to "prevent judicial second-guessing of legislative and

administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." Varig, supra, p. 2764. Examples of the types of activities that would be covered by the exception from liability include suits for damages against the government growing out of activity "such as flood control or irrigation projects," Dalehite, p. 965; a Cabinet level decision to institute a fertilizer export program, Id. p. 968; imposing a quarantine for an outbreak of foot-and-mouth disease, Id. p. 972; blasting operations conducted for deepening the Mississippi River channel, Fn. 32, Id. p. 968; negligently changing the course of the Missouri, Id.; raising the level of local ground water through the construction of a dam, Id.; or release of flood waters, Id. All of these matters call for the exercise of judgment in the formulation and implementation of policies and plans for authorized governmental activities; or for implementing a mechanism for compliance review of airplanes, Varig p. 2767.

In other words, the government may not be held liable for discretionary administrative or legislative acts involving social, economic, or political policy. Id. p. 2757. However, it may be liable for negligent execution by its employees. The distinction is that many activities of federal employees deal only with the housekeeping side of federal activities, like the federal employee who performs clerical functions or who drives the proverbial automobile. Here the discretionary function exception does not come into play. If it did, the government could never be liable for any negligent acts of its employees; the exception would swallow the rule.

In the present case, the USMS employee was simply negligent in a common-law tort sense. He was negligent in denying proper medical care to plaintiff, care which was recommended on three occasions by his treating physician, care which was "required" under the governing contract for medical services to inmates. His actions are analogous to the case cited with approval in Dalehite, supra at fn. 32, p. 968. There, plaintiff's automobile was damaged

by a rotten tree which fill on his car. The tree had been planted and grown at an experimental

government plant station. While the operation of the station and the decision to plan and

preserve this particular tree to further its experimental purposes was within the discretionary

function exception,  its negligent removal would not have been.  Similarly, in this case the

decision by defendant to have medical care for federal inmates provided by contract with local

parish jails was within the discretionary function exception, but the negligent denial of required

care to plaintiff  by a USMS clerical employee was not.

      Therefore, plaintiff maintains that the discretionary function simply does not apply in this

case, and that plaintiff' claim for common law negligence should be allowed to proceed.

*2.  In the alternative, if the discretionary function exception does apply in this case, it must be
interpreted subject to a due care obligation*

      The defendant makes much of separating Section 2680 (a) into two parts, the former

governing claims based on the execution of a regulation or statute and the second on the exercise

of a discretionary function.  Defendant then reads the "due care" requirement only into the

former portion of 2680(a), but not into the latter.  This segregation of the obligation of due care

is misplaced.  The United States Supreme Court in Hathaley v. United States, found, without

inappropriately separating the clauses of the part (a) of § 2680, that in order for the discretionary

exception function to apply the government must have exercised due care.  Hathaley v. United

States, 351 U.S. 173, 180 (1956).

      In Hathaley, Native Americans in Utah brought suit against the government for damages

resulting in the appropriation and sale or destruction of their horses by the Federal Range Agents

purporting to act under local law.  Hathaley, at 175.  In determining that the government was not

immune from suit under the discretionary function exception the court reasoned that "[d]ue care

implies at least some minimal concern for the rights of others." Id. at 180.  In that case the government agents adopted a process of confiscating horses in a manner contrary to the rights of the rightful owners of the horses. Id. at 175.  The manner in which the agents confiscated the horses violated due care and therefore eliminated part (a) of § 2680 as a defense.

The plaintiff in the case at bar proposes that the government in the instant case, just as in Hathaley, did not exercise due care in exercising its authority, and  § 2680 should be unavailable to the defendant as a defense.

Plaintiff contends that William Ard, as an agent for the United States did not exercise due care when he willfully and repeatedly acted with complete disregard of plaintiff's right to receive required medical attention while he was federal prison detainee at TPJ.  There are several instances of Mr. Ard's failure to exercise due care.

Mr. Ard denied all of Plaintiff's requests, by referral, to visit the Lallie Kemp Hospital. [Exhibit 3,4,5.]  In making his decision Mr. Ard depended solely on the recommendation of a nurse on the site, and his own evaluation of the situation.  He ignored the requests of plaintiff's treating physician, Dr. Ducote, who repeatedly requested referral of plaintiff to an off-site clinic. This was a violation of due care in that Mr. Ard had no basis upon which to overrule plaintiff's treating physician and conclude that plaintiff should not be allowed to be removed from  Second, this was a violation of due care in that Mr. Ard himself is not a medical doctor and had no way of determining just how serious the plaintiff's condition was suffering from.  Nor did he make any attempt to procure further information on the medical status of the plaintiff such as by reviewing medical records or speaking directly to Dr. Ducote.  Lastly, this was a violation of due care because the contract between USMS and TPJ mandates that authorization for removal of an inmate be given by USMS for all "required" medical services.  [Exhibit 1 Article II (2-3).]  Dr.

Ducote's request indicated that referral to a specialty clinic was "required." Nonetheless, Mr. Ard denied the request because he plaintiff's condition was not an emergency. See defendant's Statement of Undisputed Facts, para. 7. This was not the proper standard to be applied. In fact, if an inmate's condition is an emergency, USMS authorization for removal of the inmate is not required at all. Ibid., para. 4. Therefore, the denial of authorization for necessary medical care to plaintiff because it was not an emergency constituted a failure to exercise due care.

If Mr. Ard had exercised due care, and sent the plaintiff to the clinic when he was first referred, the Plaintiff would not have experienced unnecessary pain, and he would have received proper required medical attention

**CONCLUSION**

Defendant's motions must be denied because the United States acting through its agent, William Ard is not entitled immunity from the current suit under the discretionary exception function of § 2680 because that exception is not applicable to the actions of Mr. Ard. In the alternative, if the discretionary function does apply, it is subject to a due care obligation which was breached in the present case.

Respectfully Submitted,

JANE L. JOHNSON  (#7300)
CHARLES D. WILLIAMS (# 20636)
Supervising Attorneys
Tulane Law Clinic
6329 Freret Street
New Orleans, LA  70118
(504) 865-5153

TAMEKIA WHERRY

Student Attorney
Tulane Law Clinic
6329 Freret Street
New Orleans, LA  70118
(504) 865-5153

CERTIFICATE OF SERVICE

I certify that a copy of the foregoing has been served upon counsel for all represented parties to this proceeding by mailing the same to each by first class United States mail, properly addressed and postage prepaid on February 13, 2001.

TAMEKIA WHERRY

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **KENNETH BEVLEY** | : | **CIVIL ACTION** |
| **VERSUS** | : | **NO. 00-0007** |
| **UNITED STATES OF AMERICA** | : | **SECTION "T"(5)** |

## STATEMENT OF MATERIAL FACTS IN DISPUTE

In accordance with Local Rule 56.2E. plaintiff submits the following statement of material facts as to which he contends there is a genuine issue of material fact barring Summary Judgment and dismissal:

1.

While incarcerated in the physical custody of the Tangipahoa Parish Jail (TPJ), and in the legal custody of the U.S. Marshal Service (USMS), plaintiff Kenneth Bevley suffered from a serious medical condition, hemorrhoids, which was manifested by severe, continuous pain and continuous rectal bleeding.

2.

A contract existed between defendant and TPJ for the provision of medical care for federal inmates in the custody of TPJ. This contract was in place during plaintiff's incarceration and applied to plaintiff as a federal pretrial detainee. [Exhibit 1, attached.]

3.

The contract between TPJ and defendant provides that TPJ is to contact the USMS whenever a federal prisoner has to be removed from jail for medical services outside the jail facilities. In case of an emergency, prior authorization is not required; TPJ need simply notify the USMS of emergency medical cases where the inmates was transported to an outside facility. In the event of medical services, which are not emergencies, TPJ is required to contact the USMS "to obtain prior authorization for removal for all other medical services required." [Exhibit 1, Article II (2-3).]

4.

The primary purpose for the requirement of authorization to remove plaintiff for medical services is a security concern and a budgetary concern. [Exhibit 2, Deposition of William Ard, p.61, lines 14-18.]

5.

There were no security reasons to deny authorization to remove plaintiff for medical services. Therefore, the only basis for denial of authorization was for budgetary reasons.

6.

Defendant through its representative William Ard, unreasonably denied all requests for authorization to remove plaintiff Kenneth Bevley from TPJ to Lallie Kemp Hospital for medical services ordered by his physician, Dr. Bert Ducote. Defendant, through William Ard received three requests for authorization to remove plaintiff for medical care, and summarily denied all three. [Exhibit 3,4, and 5.] The basis for the denial was that the plaintiff's condition was not of an emergency nature. [Exhibit 2, deposition of William Ard, p. 13-13.]

7.

The contract between USMS and TPJ does not make a distinction between removal of inmates for emergency medical services and removal of inmates for non-emergency medical services. Rather, the contract mandates that authorization for removal of an inmate be given by USMS for all "required" medical services. [Exhibit 1 Article II (2-3).]

8.

The referral of plaintiff Kenneth Bevley to the surgery clinic at Lallie Kemp Hospital was a required medical service, ordered by his treating physician.

9.

Defendant, through its employee William Ard, had knowledge that the referral of plaintiff to the surgery clinic was a required medical service which was ordered by plaintiff's treating physician.

10.

As a result of defendant's negligent and improper denial of the required medical services for plaintiff, plaintiff was made to suffer unnecessary delay in treatment, unnecessary pain and suffering, and a physical deterioration of his condition. By October 22, 1997, plaintiff's condition had deteriorated to an emergency condition, and he was referred by Dr. Ducote to the

emergency room for treatment of a thrombosed external hemorrhoid. [Exhibit 6, deposition of Dr. Ducote, p. 13-15.]

11.

Not until ordered by Judge Porteous, who observed plaintiff in the context of plaintiff's criminal case, did defendant authorize plaintiff's removal for medical services at the surgery clinic. [Exhibit 2 deposition of William Ard, p.42 line 19 through p.43 line 2.]

12.

Plaintiff was scheduled to be brought to surgery clinic on November 18, 1997. One day before that, USMS transferred plaintiff from TPJ to the U.S. Bureau of Prisons (BOP) in Beaumont, Texas. The transfer resulted in USMS not having to pay for the plaintiff's surgery, which took place and was paid for while he was in the custody of the U.S. BOP.

13.

The denial of required medical care by defendant was negligent, constituted a failure to exercise due care, and was not a discretionary act of defendant's employee.

Respectfully Submitted,

JANE L. JOHNSON  (#7300)
CHARLES D. WILLIAMS (# 20636)
Supervising Attorneys
Tulane Law Clinic
6329 Freret Street
New Orleans, LA  70118
(504) 865-5153

TAMEKIA WHERRY

Student Attorney
Tulane Law Clinic
6329 Freret Street
New Orleans, LA  70118
(504) 865-5153

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing has been served upon counsel for all represented parties to this proceeding by mailing the same to each by first class United States mail, properly addressed and postage prepaid on February 13, 2001.

TAMEKIA WHERRY

| UNITED STATES MARSHALS SERVICE INTERGOVERNMENTAL AGREEMENT PRISONER OPERATIONS DIVISION | IGA NO. J-B34-M-755 | Page No. 2 of 6 |
| --- | --- | --- |

## ARTICLE I - PURPOSE

The purpose of this Intergovernmental Service Agreement (IGA) is to establish a formal binding relationship between the U.S. Marshals Service (USMS) and other federal user agencies (the Federal Government) and Tangipahoa Parish (the Local Government) for the detention of persons charged with or convicted of violations of Federal law or held as material witnesses (federal prisoners) at the Tangipahoa Parish Jail (the facility).

## ARTICLE II - SUPPORT AND MEDICAL SERVICES

1.  The Local Government agrees to accept and provide for the secure custody, care and safekeeping of federal prisoners in accordance with state and local laws, standards, policies, procedures, or court orders applicable to the operations of the facility.

2.  The Local Government agrees to provide federal prisoners with the same level of medical care and services provided local prisoners including the transportation and security for prisoners requiring removal from the facility for emergency medical services.  All costs associated with hospital or health care services provided outside the facility will be paid directly by the Federal Government.

3.  The Local Government agrees to notify the U.S. Marshal as soon as possible of all emergency medical cases requiring removal of a prisoner from the facility and to obtain prior authorization for removal for all other medical services required.

## ARTICLE III - RECEIVING AND DISCHARGE

1.  The Local Government agrees to accept as federal prisoners those persons committed by federal law enforcement officers for violations of federal laws only upon presentation by the officer of proper law enforcement credentials.

2.  The Local Government agrees to release federal prisoners only to law enforcement officers of agencies initially committing the prisoner (i.e. DEA, INS, etc.) or to a Deputy United States Marshal.  Those prisoners who are remanded to custody by a U.S. Marshal (USM) may only be released to a USM or an agent specified by the USM of the Judicial District.

3.  The Federal Government agrees to maintain federal prisoner population levels at or below the level established by the facility administrator.



**PLAINTIFF'S EXHIBIT**

tabbies

12

1          depending on the situation.

2    Q.    Is there any type of procedure, when a

3          federal prisoner is ill, or requires

4          medical attention, and is currently at a

5          state facility, is there any procedure or

6          policy that you have in order to provide

7          medical assistance to an inmate?

8    A.    Could you repeat that?

9    Q.    Is there any type of procedure that you

10         have, when someone -- when a federal

11         prisoner is ill, and it's at a state

12         facility, is there any written policy or

13         procedure that you have in either denying

14         or allowing the request?

15   A.    I believe there is something in the

16         marshall service manual, and also there's

17         an intergovernmental agreement that we

18         have entered into with the local jails.

19         And I just know the common practice in

20         this office was, when a call came through

21         from, say, a doctor, or a nurse, stating

22         that a prisoner had emergency problems,

23         well, then we would take care of that

24         right away.

25              If it was of a

PLAINTIFF'S
EXHIBIT
tabbies
2

13

1      nonemergency-related-type thing, we would

2      just postpone it until such a time where

3      usually they would roll out to bureau

4      prisons or something like that.

5   Q.    What was your knowledge of Kenneth

6      Bevley's condition?

7          MS. GUTIERREZ:

8              Excuse me.  Do you mean the

9          knowledge of his condition at that

10          time or the knowledge of his

11          condition now?

12          MS. COLEMAN:

13              The knowledge of his condition

14          at that time.

15          MS. GUTIERREZ:

16              What does he remember?

17   EXAMINATION BY MS. COLEMAN:

18   Q.    What do you remember?

19   A.    I remember speaking with Nurse Brumfield

20      in Tangipahoa Parish.  She made me aware

21      of a situation concerning hemorrhoids.  I

22      asked her what the doctor thought at the

23      Tangipahoa Parish jail, she said it's

24      nonemergency.  And I went with that --

25      that's basically the facts that I had at



## J. Edward Layrisson    Tangipahoa Parish

### sheriff    ex-officio tax collector

Amite 748-8147 • Hammond 345-6150 • Kentwood 229-8411        P. O. Box 727 • Amite, La. 70422

## FAX TRANSMISSION COVER SHEET

DATE: _Aug. 19, 1997_        NO. OF PAGES: _5_
(INCLUDING COVER SHEET)

TO: _Bill Oid - USM_
_D. Brett Grinetta    ③ Gregory Hawkins_

SUBJECT: _④ Kenneth Becker_

FROM: _R. Brumfield RN_

TANGIPAHOA PARISH SHERIFF'S OFFICE-JAIL
P.O. BOX 250
AMITE, LOUISIANA  70422

FACSIMILE NUMBER: 504 748-5449    ADMINISTRATIVE
                       748-4407    CRIMINAL RECORDS
                       748-4661    TANGIPAHOA PARISH JAIL
                       748-4166    DETECTIVE OFFICE-NORTH END
                       345-3531    HAMMOND SUB-STATION
                       345-0391    TRI PARISH

ADDITIONAL COMMENTS: _____

_____

_____

_____



PLAINTIFF'S
EXHIBIT
3

TANGIPAHOA PARISH JAIL
REQUEST FOR MEDICAL ATTENTION

Inmate Name _Kenneth Bailey_____ Hospital # _____
D.O.B. _10/11/56_ Race _B_ Sex _M_ S.S._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_ PIN _____
Type of Prisoner:D.O.C. ____ Parish____ I.N.S.____ U.S.Marshall:__✓__
Date of Request _08/19/97_____ Time _____ A.M. P.M.

Nature of Complaint _approved for X-Ray-(R) knee,_
_Ortho Clinic & Surgery Clinic_

Transport to local medical facility for treatment:
_____TPSO Jail      _____Earl K. Long      __✓__Lallie Kemp Hospital
_____Hammond Mental Health     _____Charity Hospital of New Orleans
_____Other Location_____

To be Completed by Examining Physician
Diagnosis: _____ -(R) knee pain_____
_____
_____

List of Current Medicines:_____.
_____

List any medicine that is discontinued:_____
_____

PLEASE CHECK APPLICABLE
____ Patient treated-No further treatment required
____ Patient treated-Prescription Issued-No further treatment needed
____ Patient treated-Prescription Issued-Patient to see doctor again
      Date:_____ Time_____

____ 1.Sick Call (Nurse Visit)------------------$3.00     _____
____ 2.Doctor Visit-----------------------------$3.00     _____
____ 3.Dentist Visit----------------------------$3.00     _____
____ 4.Psychiatric Visit------------------------$3.00     _____
____ 5.Hospital or Emergency Room Visit---------$3.00     _____
____ 6.Prescription Medication Fee--------------$2.00     _____
____ 7.Other:_____$         _____

THE ABOVE INMATE CO-PAYMENT INCLUDES ALL SELF-INITIATED REQUEST BY AN
INMATE FOR ANY TYPE OF MEDICAL, DENTAL, AND PSYCHIATRIC SERVICES OF
MEDICATION (PRESCRIPTION OR OVER THE COUNTER). THE CO-PAYMENT WILL BE
TAKEN FROM THE INMATE'S COMMISSARY ACCOUNT.

INMATES WILL NOT BE DENIED MEDICAL, DENTAL, AND PSYCHIATRIC SERVICES
OR MEDICATION IF THE INMATE DOSE NOT HAVE ANY FUNDS. HOWEVER, A
NEGATIVE BALANCE FOR THE CO-PAYMENT AMOUNT WILL BE CARRIED ON THE
INMATE'S MONEY ACCOUNT AND WHEN ANY MONEY IS RECEIVED BY THE INMATE,
CO-PAYMENT AMOUNT WILL BE DEDUCTED FROM THAT INMATE'S ACCOUNT.

Inmate Signature:_____ Date _____

Physicain Name:_____ Date _____
                                                      01/97

LKMC 376
10/94

Lallie Kemp Me _ Center
**OUTPATIENT CLI    RECORD**

| CLINIC | PHYSICIAN | DATE: AUG 14 199 | RIVED: | APPT. TIME: |
|---|---|---|---|---|

ADDRESSOGRAPH

Kenneth Senley    B/M
10/11/56
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

MODE OF ARRIVAL:    ALLERGIES:  NKA
☐ AMBULATORY
☐ WHEEL CHAIR
☐ OTHER

| ASSESSMENT: TEMPERATURE 99.3 | PULSE 88 | RESPIRATION 21 | BLOOD PRESSURE 00/70 | WEIGHT 166 | HEIGHT 6'2" |
|---|---|---|---|---|---|

C/C: Blood in stools
stomach pain

CURRENT MEDICATIONS: ∅

NURSE'S SIGNATURE: ___ Bguid Rn    TIME: 615    ☐ AM ☐ PM

**HISTORY & PHYSICAL**

c/o bleeding from Hemorrhoid
c/o R knee "giving out"

LAB & X-RAY FINDINGS

see PE sheet

PHYSICIAN SIGNATURE: ___

DIAGNOSIS/IMPRESSION: Hemorrhoids - R knee pains

PATIENT DISPOSITION:
☐ DISCHARGE  ☐ ADMIT  ☐ AMBULATORY  ☐ WHEELCHAIR  ☐ OTHER

PATIENT EDUCATION:

**NURSING ORDERS**

__ TREATMENT/REFERRALS:
- TBP 3w tid
- Hemorrhoid oint
- metamucil

**TEST AND FOLLOW-UP**

| | | |
|---|---|---|
| ☐ CBC | ☐ SMA | ☐ UA & C&S |
| ☐ EKG | ☐ LFTS | ☐ TFTS |
| ☐ LIPID PROFILE | ☐ PSA | ☐ ___ |
| ☐ X-RAY R knee | | |
| ☐ OTHER | | |

FOLLOW-UP VISIT: ___

REFERRALS: ORTHO clinic
Surgery clinic

I HAVE RECEIVED AND UNDERSTAND THESE INSTRUCTIONS:

___ RUCTIONS GIVEN BY: ___ Bguid Rn

SIGNATURE PATIENT/RESPONSIBLE PARTY

DATE 08/14/97    TIME:

**CHART**



# J. Edward Layrisson    Tangipahoa Parish

### sheriff    ex-officio tax collector

Amite 748-8147 • Hammond 345-6150 • Kentwood 229-8411        P. O. Box 727 • Amite, La. 70422

## FAX TRANSMISSION COVER SHEET

DATE: Sept. 05, 1997        NO. OF PAGES: 2
(INCLUDING COVER SHEET)

TO: Bill Aud - US Marshal

SUBJECT: Kenneth Bailey

FROM: R. Brumfield Rn

TANGIPAHOA PARISH SHERIFF'S OFFICE-JAIL
P.O. BOX 250
AMITE, LOUISIANA 70422

FACSIMILE NUMBER: 504 748-5449    ADMINISTRATIVE
                       748-4407    CRIMINAL RECORDS
                       748-4661    TANGIPAHOA PARISH JAIL
                       748-4166    DETECTIVE OFFICE-NORTH END
                       345-3531    HAMMOND SUB-STATION
                       345-0391    TRI PARISH

ADDITIONAL COMMENTS: _____
_____
_____
_____

PLAINTIFF'S
EXHIBIT
4

TANGIPAHOA PARISH JAIL
REQUEST FOR MEDICAL ATTENTION

Inmate Name _Kenneth Beulew_ _____ Hospital # _____
D.O.B._10/11/56_ Race _B_ Sex _M_ S.S _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_ PIN _____
Type of Prisoner:D.O.C. ____ Parish____ I.N.S.____ U.S.Marshall __✓__
Date of Request _09/05/97_ Time _____ A.M. P.M.

Nature of Complaint __Approval for Surgery Clinic appt__
_____
_____

Transport to local medical facility for treatment:
_____TPSO Jail    _____Earl K. Long    __✓__Lallie Kemp Hospital
_____Hammond Mental Health   _____Charity Hospital of New Orleans
_____Other Location_____

            To be Completed by Examining Physician

Diagnosis: _Ext. Hemorrhoids_ _____
_____
_____

List of Current Medicines: _____
_____

List any medicine that is discontinued:_____
_____

PLEASE CHECK APPLICABLE
____ Patient treated-No further treatment required
____ Patient treated-Prescription Issued-No further treatment needed
____ Patient treated-Prescription Issued-Patient to see doctor again
     Date:_____ Time_____

____ 1.Sick Call (Nurse Visit)------------------$3.00      _____
____ 2.Doctor Visit-----------------------------$3.00      _____
____ 3.Dentist Visit----------------------------$3.00      _____
____ 4.Psychiatric Visit------------------------$3.00      _____
____ 5.Hospital or Emergency Room Visit---------$3.00      _____
____ 6.Prescription Medication Fee--------------$2.00      _____
____ 7.Other:_____$          _____

THE ABOVE INMATE CO-PAYMENT INCLUDES ALL SELF-INITIATED REQUEST BY AN
INMATE FOR ANY TYPE OF MEDICAL, DENTAL, AND PSYCHIATRIC SERVICES OF
MEDICATION (PRESCRIPTION OR OVER THE COUNTER). THE CO-PAYMENT WILL BE
TAKEN FROM THE INMATE'S COMMISSARY ACCOUNT.

INMATES WILL NOT BE DENIED MEDICAL, DENTAL, AND PSYCHIATRIC SERVICES
OR MEDICATION IF THE INMATE DOSE NOT HAVE ANY FUNDS. HOWEVER, A
NEGATIVE BALANCE FOR THE CO-PAYMENT AMOUNT WILL BE CARRIED ON THE
INMATE'S MONEY ACCOUNT AND WHEN ANY MONEY IS RECEIVED BY THE INMATE,
CO-PAYMENT AMOUNT WILL BE DEDUCTED FROM THAT INMATE'S ACCOUNT.

Inmate Signature:_____ Date _____

Physicain Name:_____ Date _____
                                                      01/97



# J. Edward Layrisson          Tangipahoa Parish
### sheriff                    ex-officio tax collector

Amite 748-8147 • Hammond 345-6150 • Kentwood 229-8411.          P. O. Box 727 • Amite, La. 70422

## FAX TRANSMISSION COVER SHEET

DATE: Oct. 23, 1997          NO. OF PAGES: 3
                             (INCLUDING COVER SHEET)

TO: Bill and - USW

SUBJECT: Kenneth Bewley

FROM: S. Bufued RN

TANGIPAHOA PARISH SHERIFF'S OFFICE-JAIL
P.O. BOX 250
AMITE, LOUISIANA  70422

FACSIMILE NUMBER: 504 748-5449          ADMINISTRATIVE
                      748-4407          CRIMINAL RECORDS
                      748-4661          TANGIPAHOA PARISH JAIL
                      748-4166          DETECTIVE OFFICE-NORTH END
                      345-3531          HAMMOND SUB-STATION
                      345-0391          TRI PARISH

ADDITIONAL COMMENTS: Approved for
Surgery!

PLAINTIFF'S
EXHIBIT
5

TANGIPAHOA PARISH JAIL
REQUEST FOR MEDICAL ATTENTION

Inmate Name _Kenneth Bewley_____ Hospital # _217504_
D.O.B._01156_ Race _B_ Sex _M_ S.S._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_ PIN ___
Type of Prisoner:D.O.C.____ Parish____ I.N.S.____ U.S.Marshall ___
Date of Request _10/22/9?_ Time _____ A.M. P.M.

Nature of Complaint _Thrombosed ext. hemorroids_____
_____

Transport to local medical facility for treatment:
____TPSO Jail      ____Earl K. Long     ____Lallie Kemp Hospital
____Hammond Mental Health ___Charity Hospital of New Orleans
____Other Location____E.R._____

            To be Completed by Examining Physician
Diagnosis: _External Symptomatic hemorrhoid_
_____Pt needs Surgery    Hemorrhoidectomy for his problem_

List of Current Medicines: _Hemorroid Oint ; IBP;_
_____Metamucil_

List any medicine that is discontinued:_Prep H_____
_____

PLEASE CHECK APPLICABLE
____ Patient treated-No further treatment required
____ Patient treated-Prescription Issued-No further treatment needed
_X__ Patient treated-Prescription Issued-Patient to see doctor again
     Date:_____ Time_____

____ 1.Sick Call (Nurse Visit)------------------$3.00      _____
____ 2.Doctor Visit----------------------------$3.00      _____
____ 3.Dentist Visit---------------------------$3.00      _____
____ 4.Psychiatric Visit-----------------------$3.00      _____
____ 5.Hospital or Emergency Room Visit--------$3.00      _____
____ 6.Prescription Medication Fee-------------$2.00      _____
____ 7.Other:_____$          _____

THE ABOVE INMATE CO-PAYMENT INCLUDES ALL SELF-INITIATED REQUEST BY AN
INMATE FOR ANY TYPE OF MEDICAL, DENTAL, AND PSYCHIATRIC SERVICES OF
MEDICATION (PRESCRIPTION OR OVER THE COUNTER). THE CO-PAYMENT WILL BE
TAKEN FROM THE INMATE'S COMMISSARY ACCOUNT.

INMATES WILL NOT BE DENIED MEDICAL, DENTAL, AND PSYCHIATRIC SERVICES
OR MEDICATION IF THE INMATE DOSE NOT HAVE ANY FUNDS. HOWEVER, A
NEGATIVE BALANCE FOR THE CO-PAYMENT AMOUNT WILL BE CARRIED ON THE
INMATE'S MONEY ACCOUNT AND WHEN ANY MONEY IS RECEIVED BY THE INMATE,
CO-PAYMENT AMOUNT WILL BE DEDUCTED FROM THAT INMATE'S ACCOUNT.

Inmate Signature:_____ Date _____

Physicain Name:_____R_____ Date _10/23/97_
                                             01/97

PATIENT APPOINTMENT NOTICE

PATIENT DETAILS

        PATIENT:  BEVLEY ,KENNETH              MED REC #:  217504
        ADDRESS:  P O BOX 727               RESOURCE CODE:  HINSUR1
        CITY:     AMITE                     ACTIVITY TYPE:  IV
        STATE:    LA   ZIP:  70422            REFERRED BY:

                                        SCREENING EXP DATE:    /  /


        SEX:     M              - TELEPHONE:  504-345-6150
        DATE OF BIRTH:  10/11/1956

*******************************************************************************

APPOINTMENT DETAILS

        YOU HAVE AN APPOINTMENT AT THE SURGERY 1
        WITH  DR. MERRILL HINES           ON 11/18/97 AT  3:48  PM .

        PLEASE CALL 878-1537 IF YOU ARE UNABLE TO KEEP THIS APPOINTMENT.

        PLEASE BRING THIS NOTICE AND YOUR GREEN CARD TO THE CLINIC WITH
        YOU ON YOUR APPOINTMENT DATE.  PLEASE MAKE ARRANGEMENTS TO ARRIVE
        AT LEAST 15 MINUTES EARLY FOR YOUR APPOINTMENT.

        PLEASE ARRIVE AT LEAST 30 MINUTES PRIOR TO YOUR APPOINTMENT AND
        REPORT TO THE ADMIT/SCREENING REGISTRATION DESK FOR VERIFICATION
        OF INFORMATION.   THIS MUST BE DONE BEFORE YOU CHECK IN AT THE CLINIC
        DESK.

    REFERRED BY:

            LAB:

          X-RAY:

VISIT COMMENT:

U.S. DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

USDC NO. 97-3156                    SECTION "T" (5)

 *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

KENNETH BEVLEY

VERSUS

CHARLES C. FOTI, JUNIOR, ET AL

 *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

                    Deposition of DR. BERT DUCOTE,

      taken on Thursday, September 2, 1999, at

      Lallie Kemp Hospital, 52579 Highway 51

      South, Independence, Louisiana 70443,

      commencing on or about 2:40 p.m.

                    Reported and Transcribed

                    Sharon A. LeRoy

                    Certified Court Reporter

PLAINTIFF'S
EXHIBIT
tabbies
6

I'm sorry, since its non-emergency and it's outside of the jail?

A.    Yes. Normally, they would send in a request, yes.

Q.    Do your records reflect whether a request was sent in on those particular visits and whether it was approved or denied?

A.    On September 22nd, there's no record that a request was sent in, because probably she had sent in a request previously on other visits, and, you know, she didn't want to repeat.

Q.    Is that on the September 5th visit?

A.    No. She did send in a request on the September 5th visit.

Q.    Do you know if it was approved or denied?

A.    (Perusing file.) Let's see. Well, it was denied. There was a note made on September 8th. The nurse wrote, "appointment denied."

Q.    How about on -- I'm sorry to digress, Doctor. Was it August 14th, that you saw him?

A.    Yes, August 14th.

Q.    And do your records, Doctor, reflect a request being made by your office or the jail to the U.S. Marshals Service?

— 10 —

A.    Yes. It was faxed to the U.S. Marshals on August 14th.

Q.    And what was their response, if any?

Q.    It was approved August 19, 1997. The nurse wrote, "approved for x-rays of right knee, orthopedic surgeon clinic and surgery clinic." So it was approved.

Q.    How about on August 14th?

A.    That was the approval for the August -- This was August 19th. And this was for the August 14th request. So it was approved five days later, August 19.

Q.    Well, how about on August 14th report?

A.    She has "denied" here, August 14th.

Q.    So your records reflect that the August 14th visit --

A.    Was denied. But then on the next page -- (Perusing file.) I'm sorry. On August 19th, she sent approval for x-ray, and there's no answer here. "Approved for x-ray and surgery clinic." So that deny was from this request. And the nurse wrote it down.

In other words, on August 14, 1997, she faxed this request to the U.S. Marshals' Office. And when they got an answer back five days later,

— 11 —

August 19th, it was denied and she wrote it on the chart. It was denied.

Q.    So, so far, the requests that were made came back denied?

A.    Denied.

Q.    And there was never an approved request?

A.    So far.

Q.    Okay. I think our last one -- Was it September 22nd, you saw the patient, the inmate?

A.    (Perusing file.) The next one was September the 5th. The same thing: external hemorrhoids. And she faxed approval for surgery clinic.

Q.    I think we covered that one earlier.

A.    Oh, we did?

Q.    Okay.

A.    She put denied. So you say September 22nd?

Q.    Correct.

A.    September 22nd was the next visit. Same thing: external hemorrhoids.

Q.    And same emergency or lack thereof status?

A.    No emergency there, September 22nd.

— 12 —

Q.    And your prescription was the same thing: hemorrhoidal ointment, Metamucil, and ibuprofen?

A.    Right. Same thing.

Q.    Can you tell if there was a request on the September 22nd visit? Or was he even at that point referred to the clinic for there to be a request made?

A.    He was not at that point. We had just seen him and it was denied.

Q.    Okay. When is the next time that you treated the patient?

A.    The next time was October the 8th, 1997. Same thing: external hemorrhoids. Same treatment, prescriptions.

Q.    I take it, again, that his status was non-emergency?

A.    That's correct.

Q.    When is the next time that you treated the patient?

A.    The next time was October 22, 1997.

Q.    Did things change at this time a little bit?

A.    Yes. At this time, he then had a thrombosed external hemorrhoid.

— 13 —

**Page 14**

And thrombosed is spelled t-h-r-o-m-b-

A.    Yes.  That's correct.

Q.    If you can explain real quick, Doctor, how is that different from a regular hemorrhoid?

A.    Well, this way the hemorrhoid stays out and it forms a blood clot and it's a little painful.

Q.    So would it be fair to say that it's more involved than a regular hemorrhoid but it's still not an emergency situation?

A.    Well, this I consider, in my opinion, was an emergency situation.

Q.    But not life-threatening?

A.    Not life-threatening, no.

Q.    Irrespective, what course of action did you take with regard to the thrombosed external hemorrhoid?

A.    This time I referred him to the emergency room.

Q.    Consistent with your previous testimony, you didn't need approval for that because it was an emergency?

A.    Right.  That's correct.

Q.    Can you tell if he went to the

**Page 15**

emergency room?

A.    (Perusing file.)  Yes, he did.  He went to the emergency room the next day.  I have 10/23.

Q.    What happened in the emergency room?  What was the diagnosis and the prescription, if any?

A.    The emergency room doctor wrote, "external symptomatic hemorrhoids, patient needs surgery, hemorrhoidectomy, for his problem."

And he prescribed the same thing that I had been prescribing, the hemorrhoidal ointment, Metamucil, and he referred him to the general surgery clinic.

Q.    Did he refer any sought of bathing or cleansing or sitz bath?

A.    Right.  And he also prescribed sitz baths, every eight hours, soft diet, and Preparation-H.

Q.    Doctor, a hemorrhoidectomy is a surgical procedure, is it not?

A.    That's correct.

Q.    Would it be fair to say or unfair to say that it's therefore an emergency situation and must be done promptly?

**Page 16**

A.    Not a hemorrhoidectomy, in my opinion.

Q.    So you don't think that's something that's an emergency?

A.    No.

Q.    It can wait.

A.    It can wait.

Q.    When is the next time that you treated the patient?

A.    The next time was October 28, 1997.

Q.    And what was your diagnosis?

A.    He had external hemorrhoids.  And I put, "continue suppositories," which was Preparation-H and the ointment.  And I put, "referred to surgery clinic."

And they do have an appointment here for November 18, '97.

Q.    Do your notes or your nurse's notes reflect whether or not he received his sitz baths?

A.    The nurse wrote, "October 27," that's the day before, "Kenneth Bevley came to medical room for sitz baths for 20 minutes.  Patient stated he felt better."

Q.    With regard to the October 28th visit, can you tell whether approval was requested with

**Page 17**

regard to that visit?

A.    Well, yes, he already had approval for the surgery clinic for November 18th, at 3:48 p.m.

Q.    Okay.  And which visit was that initially set up at?

A.    That was evidently set up from the emergency room visit, October 23rd.

Q.    So as of October 23rd, he had an appointment with the clinic for November 18, 1997?

A.    That's correct.

Q.    Do you know if that was approved by the -- Was that approved from the sense that the U.S. Marshals Service has approved it as well, or is it just an appointment that's been made by the emergency room?

A.    I don't see any record about whether or not it was approved by the U.S. Marshals' Office.

Q.    Is that not something that would have to be approved by them?

A.    I would imagine, yes.

Q.    And your records don't show one way or the other what happened, whether a request was made?

7

1      Q.    Bevley was what type of prisoner, if

2   you know, a federal, a state, or a parish?

3      A.    He was federal.

4      Q.    And is it part of your practice,

5   Doctor, when an inmate enters the jail to do a

6   physical workup or take a physical history?

7      A.    That's correct.

8      Q.    Did you do that with regard to Mr.

9   Bevley?

10      A.    Yes, I did.

11      Q.    When did you do that, Doctor?

12      A.    I did that on August 14, 1997.

13      Q.    And what history did the inmate

14   provide?

15      A.    At the time, he get a previous history

16   of hemorrhoids and right knee pains.  And on his

17   initial visit, he was complaining of bleeding

18   from the hemorrhoids and complaining of the right

19   knee giving out.

20      Q.    Did he give any history of previous

21   surgeries?

22      A.    Well, according to my history and

23   physical, under "previous surgeries," I have

24   hemorrhoids.

25      Q.    So it would be fair to say that he told

PLAINTIFF'S
EXHIBIT

6

8

1   you that he'd had hemorrhoid surgery before?

2       A.    Evidently, because I have it listed

3   under "previous surgeries."

4       Q.    With regard to your initial entry

5   examination, did you recommend any further

6   treatment, or is that just an inventory, if you

7   will?

8       A.    Yes, I did.  I referred him to the

9   surgery clinic and orthopedic clinic.  And I

10  prescribed hemorrhoidal ointment and Metamucil,

11  which is a stool softener, so it would avoid any

12  straining at stool.

13      Q.    What is his next request or complaints

14  of pain?

15      A.    The next time I saw him -- (Perusing

16  file.)  Okay, the next complaint was August 28,

17  1997.  And he put in a request stating that he

18  was still having problems with rectal bleeding.

19      And I saw him September 5, 1997, and

20  examination showed that he had external

21  hemorrhoids.  And, again, I referred him to

22  surgery clinic and prescribed hemorrhoidal

23  ointment and Metamucil.  And, also, ibuprofen,

24  that was for the knee problem.

25      Q.    Thus far, Doctor, has there been any

1       Q.   Okay.  After three times asking for

2   permission to admit Kenneth Bevley into the

3   surgery clinic, did you feel that as an

4   employee of T.P.J. you had any other

5   obligation once surgery was denied?

6       A.   Well, the doctor had sent him to the

7   emergency room at one time, and I filled out

8   the form to send him there.  But all approvals

9   and all have to be approved at the U. S.

10   Marshall's office.

11       Q.   Okay.  So although you had asked

12   three times for the U. S. Marshall to approve

13   surgery for this patient of yours, you felt

14   that all your obligations had been fulfilled

15   once that was denied?

16       A.   Yes, ma'am.

17       Q.   And after it was denied the first

18   two times -- I know that it was specifically

19   denied -- what did you do?  Was the procedure

20   to tell the doctor or to simply write it in

21   the file?

22       A.   After the second time?

23       Q.   Right.

24       A.   I had wrote in the chart that it was

25   denied.

PLAINTIFF'S
EXHIBIT

tabbies

7

1    Q.    Okay.  And do you go back and report

2    that to the doctor?

3    A.    No, ma'am.

4    Q.    No?  You just write it in the chart,

5    correct?

6    A.    And when the inmate fills out

7    another medical request and he comes in and

8    the doctor goes back, and he'll see if he's

9    ordered surgery clinic or not, and then so

10   forth from there.

11   Q.    Okay.  I understand.  Now, what

12   about after being denied twice and no response

13   on the third time?  As a nurse, did you feel

14   any ethical obligation after the denials of

15   surgery?

16   MR. VINCENT:

17                Objection to the question on

18                the grounds of relevance.  But go

19                ahead and answer the question.

20

21   MR. HASSINGER:

22                I object to the form of the

23                question -- this is Joe

24                Hassinger -- because it's vague

25                and confusing as phrased.

755 MAGAZINE STREET, SUITE 200
NEW ORLEANS, LOUISIANA 70130
AFFILIATED REPORTING TECHNOLOGY, INC.
OFFICIAL COURT REPORTERS
Ph. (504) 523-3747
Fax (504) 522-4777

# AFTERCARE INSTRUCTIONS
## FOR
### EMERGENCY DEPARTMENT

BEVLEY , KENNETH
P O BOX 727
AMITE        , LA  70422
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    FC  C
DR. DUCOTE BERT

## WOUND CARE (cuts, abrasions, burns)

---- Keep wounds as clean and dry as possible.
---- After 2 days, start daily cleaning with soap and water, then peroxide, then cover with new dressing.
---- Cleanse wound 3 times a day with peroxide and apply antibiotic ointment.
---- Cleanse burns daily with soap and water, then apply antibiotic cream and a fresh non-stick dressing like Telfa pad or adaptic.
---- Elevate the injured part to prevent swelling & pain.
---- If signs of infection develop (such as redness, pus, red streaks, warmth or increased pain) return for recheck and treatment.

## BRUISES, SPRAINS AND FRACTURES

---- Elevate the injured part to lessen swelling and pain - higher than your heart is best.
---- During the first 24-48 hrs. (and longer if you like) use ice in a plastic bag, covered with a cloth.
---- If your dressing or ace bandage is too tight, you may remove & re-apply it yourself.
---- You must keep your cast or splint dry.
---- No pressure on your cast or splint for 48 hrs.
If you have swelling, numbness, increased pain, or your fingers or toes feel cold or turn blue, you must return immediately for recheck.

## HEAD INJURIES

It is expected to have mild symptoms after an injury to the head. These would include headache, vomiting, slight dizziness and a short time of altered consciousness.

It is suggested to allow only clear liquids for 12 hours after the injury. Sleep is not to be avoided if desired by the injured person. Aspirin/Tylenol may be given for the headache. Stronger pain relievers should be avoided for 3 days. If any of the following symptoms occur, your doctor should be notified immediately.

1) Eye pupils are not the same size.
2) Vomiting is persistent or forceful.
3) Headache is persistent and strong enough to interfere with activity or sleep.
4) Inability to arouse injured person from sleep. Awaken person every 2 hours while sleeping to check this out.
5) A watery drainage or blood noted from ears or nose.
6) Inability to move an arm or leg or numbness of the same.
7) A convulsion or fit.
8) Clumsy walking.

## VENEREAL DISEASE

1) No sex for 2 weeks.
2) Follow-up at the health unit in one week.
3) Have sex partner report to the health unit for evaluation.
4) Take all of the medicine prescribed.

## THREATENED MISCARRIAGE

1) Until vaginal bleeding and abdominal pains are gone:
   a. STRICT BEDREST.
   b. No intercourse, douching, or tampons.
2) Keep/Make OB appointment.
3) Return to ED for fever, passing tissue, bad pains or bad bleeding

## MEDICATIONS/PRESCRIPTIONS

1) Consult your pharmacist regarding any possible food/drug interactions.

---

You will need to be rechecked:

[ ]  Return to Emergency Department _____
_____

[ ] Call _____ for _Gen Surg_ Clinic appointment

[ ] Next available    [ ] _____ weeks

[ ] _____ (date) per Dr. _____

[ ]  MEDICATIONS AND OTHER SPECIFIC INSTRUCTIONS

- Refer to Gen Surg
  for Hemorrhodectomy
- Prep-H topically TID.
- SITZ-Bath QD8.
- Soft diet (cereal and milk)

[ ]  ACTIVITIES

[ ] Normal   [ ] Unlimited   [ ] Bed Rest

[ ]  DIET

[ ] Normal   [ ] Other _____

**IMPORTANT NOTICE**

Your x-ray has been read on a preliminary basis. Final consultation and review by the radiologist will be made the following day.

Follow-up treatment by a physician may be important for your safety. Please follow carefully the instructions given on this sheet.

The above instructions were read to me. I understand them fully and have received a copy.

NAME _Peter Brown (Self)_

RELATION TO PATIENT _____

PHYSICIAN'S SIGNATURE _____    DATE 10/23/97

NURSE'S SIGNATURE _____    TIME

PLAINTIFF'S EXHIBIT
9

Date of Printing: FEB 12,2001

**KEYCITE**

CITATION: ▷ **U.S. v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines), 467 U.S. 797, 104 S.Ct. 2755, 81 L.Ed.2d 660 (U.S.Cal., Jun 19, 1984) (NO. 82-1349, 82-1350)**
**History**
**Direct History**

1  United Scottish Ins. Co. v. U. S., 614 F.2d 188 (9th Cir.(Cal.) Nov 29, 1979) (NO. 76-2813, 76-2817) (Additional Negative History)
*Appeal After Remand*

2  United Scottish Ins. v. U. S., 692 F.2d 1209 (9th Cir.(Cal.) Oct 08, 1982) (NO. 81-5062) (Additional Negative History)
*Certiorari Granted by*

3  U.S. v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines), 461 U.S. 925, 103 S.Ct. 2084, 77 L.Ed.2d 296 (U.S.Cal. May 16, 1983) (NO. 82-1349, 82-1350)
*AND Judgment Reversed by*

=>  4  **U.S. v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines),** 467 U.S. 797, 104 S.Ct. 2755, 81 L.Ed.2d 660 (U.S.Cal. Jun 19, 1984) (NO. 82-1349, 82-1350)
*Rehearing Denied by*

5  U.S. v. United Scottish Ins. Co., 468 U.S. 1226, 105 S.Ct. 26, 82 L.Ed.2d 919 (U.S.Cal. Aug 16, 1984) (NO. 82-1350)
*AND On Remand to*

6  S.A. Empresa De Viacao Aerea Rio Grandense (Varig Airlines) v. U.S., 744 F.2d 1387 (9th Cir. Oct 12, 1984) (NO. 81-5366, 81-5062)

7  S.A. Empresa De Viacao Aerea Rio Grandense (Varig Airlines) v. U.S., 692 F.2d 1205 (9th Cir.(Cal.) Oct 26, 1982) (NO. 81-5366, 81-5399) (Additional Negative History)
*Certiorari Granted by*

8  U.S. v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines), 461 U.S. 925, 103 S.Ct. 2084, 77 L.Ed.2d 296 (U.S.Cal. May 16, 1983) (NO. 82-1349, 82-1350)
*AND Judgment Reversed by*

=>  9  **U.S. v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines),** 467 U.S. 797, 104 S.Ct. 2755, 81 L.Ed.2d 660 (U.S.Cal. Jun 19, 1984) (NO. 82-1349, 82-1350)
*Rehearing Denied by*

10  U.S. v. United Scottish Ins. Co., 468 U.S. 1226, 105 S.Ct. 26, 82 L.Ed.2d 919 (U.S.Cal. Aug 16, 1984) (NO. 82-1350)
*AND On Remand to*

11  S.A. Empresa De Viacao Aerea Rio Grandense (Varig Airlines) v. U.S., 744 F.2d 1387 (9th Cir. Oct 12, 1984) (NO. 81-5366, 81-5062)

**Negative Indirect History**

*Declined to Extend by*

12  Leone v. U.S., 690 F.Supp. 1182 (E.D.N.Y. Jun 08, 1988) (NO. CV 87-1568 (RJD), CV 87-1609 (RJD)) (Additional History) ****

*Distinguished by*

13  McMichael v. U.S., 751 F.2d 303, 53 USLW 2365 (8th Cir.(Ark.) Jan 02, 1985) (NO. 83-2497) (Additional History) ****

14  Hylin v. U.S., 755 F.2d 551, 1984-1985 O.S.H.D. (CCH) P 27,185 (7th Cir.(Ill.) Feb 13, 1985) (NO. 81-2931) (Additional History) ****

15  Gary Sheet & Tin Employees Federal Credit Union v. U.S., 605 F.Supp. 916

© Copyright West Group 2001

**History**
**Negative Indirect History**

*Distinguished by*

> (N.D.Ind. Mar 19, 1985) (NO. H 82-606) ****
>
> 16  Drake Towing Co., Inc. v. Meisner Marine Const. Co., 765 F.2d 1060
> (11th Cir.(Ala.) Jul 16, 1985) (NO. 84-7478) (Additional History) ***
>
> 17  Pierre v. U.S., 741 F.Supp. 306 (D.Mass. Jul 11, 1990) (NO. CIV.A. 83-4214-S) ***
>
> 18  Arkansas River Co. v. CSX Transp., 780 F.Supp. 1138, 1992 A.M.C. 1108
> (W.D.Ky. Apr 25, 1991) (NO. CIV.A. C90-0024-P(J)) ***
>
> 19  Irving v. U.S., 942 F.Supp. 1483, 17 O.S.H. Cas. (BNA) 1705,
> 1996 O.S.H.D. (CCH) P 31,181 (D.N.H. Aug 29, 1996) (NO. CV-81-501-M)
> (Additional History) ****

*Limitation of Holding Recognized by*

> 20  Myers v. U.S., 17 F.3d 890, 62 USLW 2560, 1994 O.S.H.D. (CCH) P 30,357,
> 1994 Fed.App. 0070P (6th Cir.(Tenn.) Mar 01, 1994) (NO. 92-5812, 92-5813,
> 92-5814, 92-5816), rehearing denied (Jul 25, 1994) (Additional History) ***

© Copyright West Group 2001